UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,                                 CASE NO. 11-CR-20564

v.                                            HON. MARK A. GOLDSMITH

D-6    CARL LEE JONES,

    Defendant.
_____/

**<u>UNITED STATES' RESPONSE OPPOSING BOTH
DEFENDANT'S REQUEST FOR HOME CONFINEMENT AND
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE</u>**

Carl Jones was part of a large drug trafficking conspiracy. He sold nine kilograms of cocaine during the conspiracy.

Jones pleaded guilty to this charge in February 2013. He has a history of alcohol and marijuana abuse. PSR at par. 106. While on bond in this case, Jones twice tested positive for drug use. *Id.*

This was not Jones' first federal drug conviction; he has one prior such conviction. He also has four misdemeanor convictions, including one for drunk driving and one for domestic violence -- where he punched a woman with his closed fist. *Id.* at pars 37 - 41.

In December 2013, Jones was sentenced to 120 months' custody and 5

1

years' supervised release. Jones' current projected release date is August 11, 2022. See Exhibit 2. Jones now moves for home detention/early release, which the government also construes as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of September 23, 2020, these directives have already resulted in at least 7,666 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, although Jones exhausted his administrative remedies, Jones does not satisfy the statutorily mandated criteria for compassionate release. This counsels against Jones' motion.

Jones did submit a request for compassionate relief on the basis of health issues, including Covid-19. *See* Exhibit 3, dated May 12, 2020 (Sealed). The

2

following month, the Warden denied Jones' request (Exhibit 4) (Sealed). Jones thus exhausted his administrative remedies.

But that does not end the inquiry. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Jones' failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Jones' age (48) and health concerns do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Jones has a liver problem and exercised-induced asthma, but according to his medical records his condition appears to be well-managed – when he takes his medication. *See* Exhibits 5 (2019 medical records) and 6 (2020 medical records) (Sealed). But Jones has sabotaged his own health by refusing to take all his prescribed and recommended medicines and ignoring corrective medical instructions while in custody. *See* Exhibit 5 at date 09/20/19. *See also, e.g.,* Exhibit 6 at dates 01/29/20, 03/25/20, 04/01/20, 05/27/20, 06/10/20, 07/02/20, 07/08/20, 08/19/20, 09/01/20.

Moreover, as recently as August 26, 2020, Jones' liver functions were improving ("Hepatic inflammation is trending down" (Exhibit 6)). Indeed, on July 02, 2020, Jones stated he was feeling well and had no complaints (Exhibit 6).

Jones believes that he needs a liver transplant. But in July of this year, medical personnel disputed Jones' claim: "Although the GI [gastrointestinal] in 2018 mentioned future liver transplant, disease is not currently progressed enough

3

for transplant." (Exhibit 6 at 07/02/2020).

Moreover, even if Jones was able to articulate extraordinary or compelling reasons to warrant compassionate release, his offense conduct, failure to abide by the terms of his bond in this case, his past convictions, use of alias names and identities, and misconduct while incarcerated make him a danger to the community, *see* USSG § 1B1.13(2), which is itself sufficient to bar his eligibility for relief. Consequently, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release. For all these reasons, the Court should deny Jones' motion.

## Background

Jones conspired to distribute nine kilograms of cocaine with one of the lead defendants in this case. Defendant pleaded guilty to the drug conspiracy (cocaine, over 5 kilograms). Following his guilty plea, the court sentenced Jones to 120 months' imprisonment to be followed by 5 years of supervised release.

Jones is currently incarcerated at La Tuna Federal Correctional Institution in Texas (which, as of September 23, 2020, has 21 confirmed cases of covid-19 — 17 inmates and four staff members). All inmates and staff members who were previously confirmed to have covid-19 have recovered.

Jones has moved for early/compassionate release, citing his liver ailment and other alleged infirmities, including exercise-induced asthma. For the reasons set

forth in this Response, the Court should deny Jones' motion.

**I.     The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.     The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a [detailed protocol](#) for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* [BOP Covid-19 Modified Operations Website](#). Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until May 18, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended in order to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected

from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,783 federal inmates have been granted home confinement since the Covid-19 pandemic

7

began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

The Bureau of Prisons must also balance another important consideration:

8

how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates — particularly those who have been convicted of serious offenses or have a lengthy criminal record or have violated supervision in the past — have been already proven unwilling to abide by society's most basic norms. It is more than reasonable to evaluate whether a particular inmate would adhere to release conditions, social-distancing protocols, and stay-at-home orders during the pandemic. And if a prisoner would be unlikely to take any Covid-19 restrictions seriously, he would also be far more likely than the general public to contract and spread Covid-19 if released.

The Bureau of Prisons also must account for the current strain on society's first responders. Police departments in many cities have stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen [spikes in shootings and murders](). Child sex predators have [taken advantage]() of bored school-aged kids spending more time online. [Covid-19-based fraud schemes]() have proliferated. There are real risks to public safety, and those risks will only increase if communities are faced with a sudden influx of prisoners. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to Covid-19 and whose release will least endanger the public.

Finally, the Bureau of Prisons' home-confinement initiative allows it to

9

marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. Here, given the lack of any detailed release plan, any such components cannot be evaluated. The Bureau of Prisons must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released particularly where, with Jones, an inmate has violated conditions of supervision/bond in the past. Those types of system-wide resource-allocation decisions are difficult even in normal circumstances.

## II. The Court should deny Jones' motion for compassionate release.

Jones' motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific

statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, even where a defendant exhausts his administrative remedies, he must also show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, *and* he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). Jones is ineligible for relief as he has both (1) failed to offer any "extraordinary and compelling reasons" and (2) remains a danger to the community.

*Second*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and

11

characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). Jones' personal characteristics and prior criminal conduct pose too great a risk to the community; he is ill-suited for compassionate release.

### A. There are no extraordinary and compelling reasons to grant Jones compassionate release.

Even though Jones has had exhausted his administrative remedies, compassionate release would be improper. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the

12

same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in [Program Statement 5050.50](). USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Jones' circumstances include some physical ailments. But he exacerbated

his condition by failing to follow health care instructions and not taking his prescribed and recommended medications, as shown above.  He should not be allowed to self-sabotage his health and use that as a basis for early release.  And Jones' main contention that he urgently needs a liver transplant is contradicted by his medical records from this year, as also shown above.  Taken as a whole, his medical records do not establish that Jones is high-risk or even particularly susceptible to Covid-19.   Looking at Jones' medical records in their entirety, Jones fails to explain why his maladies are extraordinary such as to warrant early release.  Moreover, he is not elderly; Jones is only 48 years old.  A review of Jones' situation leads to the conclusion that it is not extraordinary or compelling under the Guidelines.  See USSG § 1B1.13 cmt. n.1.

Nor is Jones correct in suggesting or implying that the Covid-19 pandemic should alter this analysis here. Even assuming, in other cases, that a defendant's risk from Covid-19 might make the difference in his eligibility for release under § 1B1.13, Jones' circumstances do not satisfy that standard.

Further, as Jones' prior conduct shows, he would also be unlikely to follow basic restrictions on release—much less the CDC's social-distancing protocols or a stay-at-home order.  Jones' criminal history includes not only this federal cocaine conspiracy, but another one involving over 100 kilograms of cocaine.  (Exhibit 1, PSR, at par. 39) (Sealed).  He has four misdemeanors including domestic

violence/punching a woman and drunk driving. (*Id.* at pars 40 and 41).

Jones is well-versed in the use of alias identities. He used five alias names, one alias birthdate, and two alias social security numbers in the past. (*Id.* at page 2). He was convicted for using another person's driver's license. (*Id.* at par. 37).

Also, Jones has been disciplined while incarcerated on three separate occasions, including phone abuse and refusing to obey an order/being insolent to prison staff. *See* Exhibit 7 (Jones' in-custody disciplinary history) (Sealed).

Jones' past behavior is a pattern of non-compliance with the law and with authority in general. He is hardly a good candidate for early release.

At any rate, it is not clear that Jones, who was unemployed at the time of this conspiracy (Ex. 1 at par. 75), faces a greater risk of Covid-19 now than he would if released. But it is clear that Jones is dangerous and does not follow the law, rules of conduct, or even medical advice.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from

Covid-19 to Jones and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597.

Jones is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." But Jones' prior drug, alcohol, and domestic violence convictions show that he clearly remains a danger to the community. Jones engaged in transactions involving significant quantities of drugs, and the Sixth Circuit has routinely affirmed findings of dangerousness for "run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010). Further, the government's belief in Jones' dangerousness is reinforced by his in-custody disciplines and other prior conduct. This factor, too, forecloses relief here.

Jones is not eligible for compassionate release.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine whether those factors support

release. So even if the Court were to find Jones eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Here, Jones sold nine (9) kilograms of cocaine. Again, Jones has previous convictions for felony cocaine conspiracy, drunk driving, and domestic violence.

The instant cocaine conviction should give this court pause in considering Jones' motion. Drug trafficking itself, "even without any indication that the defendant has engaged in violence," poses a danger to the community. *See Id.* at 947, n.6; *accord*, *United States v. Hinton*, 113 F. App'x 76 (6th Cir. 2003)(cocaine conspiracy). The Sixth Circuit is not alone in this view. The Fifth Circuit has, in the context of discussing bond, stated that the "risk of continued narcotics trafficking on bail constitutes a risk to the community." *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). The Second Circuit likewise has stated that it is "clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger.'" *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985).

Jones is not a small-time drug dealer. In this case alone, he trafficked large amounts of cocaine.

His earlier criminal history is troubling, too. Jones has a significant prior federal drug conviction. He committed domestic violence by hitting a woman with his closed fist. He drove drunk.

Jones' conduct while incarcerated further adds to the concern about his dangerousness. Defendant was disciplined three times.

The Court imposed a sentence of 120 months' incarceration after having considered the relevant 3553(a) factors; nothing significant about that analysis has changed. Jones remains a danger to the community. For all these reasons, this court should deny defendant's motion.

### III. If the Court were to grant Jones' motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Jones' motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

### Conclusion

Jones' motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ *David J. Portelli*
DAVID J. PORTELLI
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9711
dave.portelli@usdoj.gov
P40688

Date: September 24, 2020

## Certificate of Service

I hereby certify that on September 24, 2020, I caused the foregoing document to be electronically filed with the Clerk of the Court using the ECF system.

I further certify that I caused the foregoing document and all accompanying exhibits, including those filed under seal, to be submitted for transmission to defendant by United States Postal Service to the following non-ECF participant:

Carl Lee Jones  
Register No. 22389-039  
FCI La Tuna  
Federal Correctional Institution  
P.O. Box 3000  
Anthony, NM 88021

s/*David J. Portelli*  
DAVID J. PORTELLI  
Assistant U.S. Attorney